UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JODY LYNN SCANLON,

        Plaintiff,

    v.

LIFE INSURANCE COMPANY
OF NORTH AMERICA,

        Defendant.

C08-0256-JCC

**ORDER**

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 54), and Plaintiff's motion for partial summary judgment. (Dkt. No. 65). The Court has considered Plaintiff's response to Defendant's motion (Dkt. No. 58), Defendant's reply (Dkt No. 67), and Plaintiff's surreply. (Dkt. No. 70). The Court has also considered Defendant's response to Plaintiff's motion (Dkt. No. 75), Plaintiff's reply (Dkt. No. 83), and Defendant's surreply. (Dkt. No. 87). Finally, the Court has considered the parties' various declarations and exhibits, and concluded that oral argument is unnecessary.

For the reasons explained below, the Court hereby GRANTS Plaintiff's motion with respect to her contract and bad-faith breach claims. The Court GRANTS Defendant's motion with respect to Plaintiff's claims sounding in the Washington Consumer Protection Act.

# I.    BACKGROUND

This case stems from an insurance dispute. In October 2003, Plaintiff Jody Lynn Scanlon purchased a $500,000 accidental-death-and-dismemberment policy made available to her as part of her employment with King County for her husband Michael Scanlon. Mr. Scanlon died on November 2, 2006. Defendant Life Insurance Company of North America (LINA) refused to pay Plaintiff's claim for benefits, having concluded that Mr. Scanlon's death was not attributable to an accident. In relevant part, the policy language reads:

> We agree to pay benefits for loss from bodily injuries:
>> (a) caused by an accident which happens while an insured is covered by this policy; and
>> (b) which, directly and from no other causes, results in a covered loss.
> We will not pay benefits if the loss was caused by:
>> (a) sickness, disease, or bodily infirmity; or
>> (b) any of the exclusions listed in the policy.

(Policy 1 (Dkt. No. 55-2 at 2)). The only relevant exclusion listed in the policy contains language mirroring clause (b), stating that Defendant will refuse to pay benefits "for loss resulting from . . . sickness, disease, bodily or mental infirmity[.]" (*Id.* 3).

Mr. Scanlon suffered from heart problems and multiple sclerosis, which made it difficult for him to walk and rendered him prone to falls. Because of these and other health problems, he had been living at the Park Place assisted-living facility since December 2005. Mr. Scanlon's health was in long-term decline, but he was still somewhat independent at the time of his death. Approximately one week before he passed away, Park Place staff completed an assessment which described him as able to ambulate with the aid of a walker and leg brace, able to dress and undress himself, and able to attend to his general hygiene, including showering. (Annual Report (Dkt. No. 58-2 at 4–9)).

Park Place staff discovered Mr. Scanlon lying unresponsive on the bathroom floor of his suite on the evening of November 1, 2006. He was taken to the hospital, where doctors pronounced him brain-dead. Mr. Scanlon was removed him from life support, and he passed away early the next morning. (Pl. Opp'n 4 (Dkt. No. 58)). In the days after her husband's death, Plaintiff Jody Scanlon learned that Park

Place workers had found him on a hard, tiled area of flooring near the shower. (Scanlon Decl. 2 (Dkt. No. 58-1)). Hospital physicians concluded that Mr. Scanlon died from a subdural hematoma, a type of brain injury. (Hospital Report (Dkt. No. 79 at 77)). Dr. Aldo Fusaro, an associate medical examiner for King County, performed an autopsy. Dr. Fusaro agreed with the hospital doctors' diagnosis, attributing Mr. Scanlon's death to a large subdural brain hemorrhage. Dr. Fusaro presumed that the injury had been caused by blunt force trauma to the head. The autopsy concluded: "The manner of death is accident." (Autopsy 1 (Dkt. No. 55-3 at 4)). While both Dr. Fusaro and hospital physicians noted that Mr. Scanlon suffered from heart problems, none of them attributed his death to a heart attack.

Plaintiff submitted an insurance claim on November 8, 2006. In response to a question asking how the accident occurred, Plaintiff wrote, "He fell while alone in his room at his assisted-care facility, striking his head, causing a fatal cerebral hematoma." (Claim (Dkt. No. 55-3 at 14)). Ms. Sheri Leister, an accident-claims specialist, reviewed Plaintiff's claim for Defendant LINA. As part of her review, Ms. Leister requested the opinion of Dr. Norton Hall, who worked as a physician-adviser for Defendant. (Letter to Dr. Hall (Dkt. No. 55-3 at 33)). Dr. Hall prepared a handwritten, two-sentence memorandum report which concluded that Mr. Scanlon had died from a heart attack, and that he fell only after having lost consciousness. Dr. Hall also concluded that certain anticoagulant heart medication Mr. Scanlon was taking had contributed to his death. (Hall Report (Dkt. No. 55-3 at 35)). Two days after receiving Dr. Hall's report, Ms. Leister sent Plaintiff a letter informing her that Defendant was denying her claim for benefits. The letter stated: "The medical evidence and our physician adviser's review has established that Michael Scanlon's fall was the result of an acute myocardial infarction and accelerated by anticoagulant therapy." (Denial Letter 3 (Dkt. No. 55-3 at 39)).

Plaintiff secured the representation of attorney Michael Nelson, who continues to represent her in this matter. After meeting with LINA representatives, Mr. Nelson wrote a lengthy letter documenting Plaintiff's potential claims for relief, and offering to settle the case for $650,000. Mr. Nelson strongly

criticized Defendant's claims investigation, especially Dr. Hall's report, which the letter described as a "two-sentence scribble":

> [T]his doctor somehow argues that the myocardial infarction leads to unconsciousness, then to a subsequent fall, and then, out of the fall, evolves the subdural hematoma, which is then accelerated by the anticoagulant therapy. *What is he relying on?* The doctor concludes with the statement: "Of note is the absence of external trauma to scalp, face or head." This sounds like two arguments at once: the subsequent fall produced a subdural hematoma, but then possibly he didn't fall because there was an absence of external trauma to the head or scalp. Which is it? The "doctor" appears to argue both.

(Nelson Letter 5–6 (Dkt. No. 55-4 at 7–8)) (some emphases removed or modified). Mr. Nelson included with the letter a report prepared by Dr. Bennet Omalu, a board-certified clinical pathologist who is the chief medical examiner of San Joaquin County in California. Dr. Omalu was unsparing in his criticisms of Defendant's investigation and conclusions, describing "[t]he grounds, basis and justifications for the denial of Mr. Scanlon's death benefits" as "scientifically invalid" and "grossly outside the established and generally accepted guidelines and principles in clinical and forensic medicine." (Omalu Report 5 (Dkt. No. 55-4 at 26)). Relying on post-mortem blood tests and autopsy information, Dr. Omalu specifically rejected the possibility of a heart attack. He concluded that Mr. Scanlon had died exactly as Plaintiff had reported in her claim for benefits: "Within a reasonable degree of scientific certainty, it is my opinion that Michael Scanlon, a fifty-six-year-old white male, suffered a fall on November 1, 2006, at the assisted-living center where he was living." (*Id.* 11).

Upon receiving this information, Defendant re-opened its investigation. Mr. Brian Billeter, a claims specialist, asked Dr. Scott Denton to review several materials and form conclusions about how Mr. Scanlon had died. Dr. Denton largely agreed with Dr. Fusaro's diagnosis, concluding that "the cause of death for Mr. Michael Scanlon is a subdural hematoma, presumed due to a minor occult blunt trauma of the head." (Denton Report 1 (Dkt. No. 55-4 at 50)). Dr. Denton stated that anticoagulant drugs had served as a "significant contributing factor" to Mr. Scanlon's death, but nonetheless concluded that "the manner of death is still best certified as accidental." (*Id.* 2).

Mr. Billeter sent a letter to Mr. Nelson in January 2008, notifying him that Defendant would continue to deny Plaintiff's claim for benefits. Mr. Billeter stated that Plaintiff had failed to carry her burden of establishing coverage because the evidence tended to show that Mr. Scanlon's multiple sclerosis contributed to his fall, and that anticoagulant drugs had contributed to the subdural hematoma. (Billeter Letter (Dkt. No. 55-4 at 63–64)). Plaintiff filed this lawsuit in February 2008. She alleges that Defendant's refusal to pay her claim for damages represents a bad-faith breach of the insurance contract. In addition to economic damages, she seeks compensation for emotional distress. Plaintiff avers that dealings with Defendant caused her to develop shingles and sleeping problems, as she became overly preoccupied about mortgage obligations. She also states: "I found the treatment from LINA to be personally offensive. I had bad dreams about Michael coming after me because I was not able to take care of the property and the kids. A parent is supposed to support their children and here I wasn't able to do so." (Scanlon Decl. 3 (Dkt. No. 58-1)).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. "When a motion for summary judgment is properly made and supported, an opposing party . . . must—by affidavits or as otherwise provided in this rule—set out specific facts showing a

genuine issue for trial." FED. R. CIV. P. 56(e)(2). *See also Anderson*, 477 U.S. at 250. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Id.* at 323–24.

The facts in this case are not generally in dispute. The parties' disagreements have to do with what legal consequences flow from them, making this a case where summary judgment is appropriate. *See, e.g., Edison v. Reliable Life Ins. Co.*, 664 F.2d 1130, 1131 ("Summary judgment is appropriate [when] the only dispute concerns the legal effect of language in the policy.").

## III.    DISCUSSION

Because this matter is before the Court pursuant to its diversity jurisdiction, the law of Washington State governs. *See, e.g., Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941). Washington law creates a "quasi-fiduciary relationship between an insurer and its insured," which requires an insurer to "deal fairly with an insured, giving equal consideration in all matters to the insured's interests as well as its own." *Van Noy v. State Farm Ins. Co.*, 142 Wn.2d 784, 16 P.3d 574, 578–79 (Wash. 2001). Quasi-fiduciary duties exist even when the interests of an insurance company and its customer are adverse. As the State Supreme Court stated:

> The fiduciary relationship existing between insurer and insured exists not only as a result of the contract between insurer and insured, but because of the high stakes involved for both parties to an insurance contract and the elevated level of trust underlying insureds' dependence on their insurers. *This dependence and heightened level of trust exists not only where the insurer's and insured's interests are aligned, as in the third-party context, but also, and perhaps even more so, in the first-party context, where the insurer's interests might be opposed to the insured's and the insured is particularly vulnerable and dependent on the insurer's honesty and good faith.*

*Id.* at 793 n.2 (emphasis added).

//

## A.      Breach of Contract

Both parties move for summary judgment with respect to Plaintiff's claims sounding in breach of contract. Each party offers a different interpretation of the policy language to support its motion before then turning to the facts. This Court follows the same approach. First, the Court resolves the legal issue of policy interpretation. *See Washington Pub. Utilities System v. Utility District No. 1 of Clallam County*, 112 Wn.2d 1, 771 P.2d 701, 706 (Wash. 1989) ("Insurance polices are to be construed as contracts, and interpretation is a matter of law."). Having determined the law of the case, the Court then turns to the question of whether material issues of fact remain for trial. *See Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 78 P.3d 1274, 1277 (Wash. 2003) (stating, in the context of a summary-judgment motion in an insurance case, that "[t]he legal inquiry shapes what is a material fact.").

### i.      Policy Interpretation

Washington courts read insurance-policy contracts through the eyes of the average person. *See National Union Fire Ins. Co. v. Zuver*, 110 Wn.2d 207, 750 P.2d 1247, 1248 (Wash. 1988) ("[I]t is a rule of insurance-contract construction that an insurance policy must have meaning to lay persons who at their peril may be legally bound or held to understand the nature and extent of its coverage."). The average person is assumed to understand the meaning of clearly drafted policy provisions: "If the language of the policy is clear and unambiguous, the court may not modify the contract or create an ambiguity where none exists." *Id.* In the face of ambiguity, however, Washington law requires that a court interpret the policy in favor of the policy holder. *See, e.g., Vadheim v. Continental Ins. Co.*, 107 Wn.2d 836, 734 P.2d 17, 20 (Wash. 1988) ("[I]f any clause is ambiguous, the court must apply a construction that is most favorable to the insured, even though the insurer may have intended another meaning."). A clause in a policy is ambiguous when it susceptible to two different meanings, both of which are reasonable. *Morgan v. Prudential Ins. Co. of America*, 86 Wn.2d 432, 545 P.2d 1193, 1195 (Wash. 1976).

The policy language in this case includes an inclusionary clause which promises to indemnify the insured against losses caused by accidents, and an exclusionary clause which disclaims insurance-company liability for losses caused by sickness and disease. It reads:

> We agree to pay benefits for loss from bodily injuries:
> (a) caused by an accident which happens while an insured is covered by this policy; and
> (b) which, directly and from no other causes, results in a covered loss.
> We will not pay benefits if the loss was caused by:
> (a) sickness, disease, or bodily infirmity; or
> (b) any of the exclusions listed in the policy.

(Policy 1 (Dkt. No. 55-2 at 2))

Judges have long struggled with how to define "accident" for purposes of insurance law, as well as how to decide whether an accident "directly and from no other causes" resulted in injury.[1] In *Man, God and the Serbonian Bog: The Evolution of Accidental Death Insurance*, Professor Adam Scales recounts the history of accident insurance from its origins as railway-passenger insurance during the era of the "iron horse." 86 IOWA L. REV. 173 (2000).[2] Courts encountered the problem of the "'eggshell-skulled insured,'—a policyholder who fatally succumbs to a minor mishap because of some constitutional infirmity" almost immediately after accident insurance emerged. *Id.* at 201. Generally, courts applied the tort principles of but-for and proximate causation, requiring an insurance company to "take its policyholder as it found him[.]" *Id.* at 227. Professor Scales quotes a Missouri court for the

---

[1] *See, e.g., Fegan v. State Mutual Life Assurance Co.*, 945 F. Supp. 396, 399 ("What generally qualifies as an 'accident,' as that term is used in policies providing insurance against accidental death, appears to be one of the more philosophically complex simple questions.").

[2] The reference to the Serbonian Bog comes from Justice Cardozo's dissent in *Landress v. Phoenix Life Ins. Co.*, 291 U.S. 491 (1934). The majority rejected a widow's claim for benefits after her husband died from heat stroke, relying on a distinction between "accidental means" and "accidental results." Justice Cardozo's dissent, which has proven far more influential than the majority opinion, stated that the distinction would only cause confusion: "The attempted distinction between accidental results and accidental means will plunge this branch of law into a Serbonian bog." *Id.* at 499 (Cardozo, J., dissenting).
   The Serbonian bog was a vast tract of morass, the center of which formed the Sirbonian Lake, lying between the Isthmus of Suez and the Mediterranean Sea. Ancient historians report that entire armies were lost in its quicksands. WILLIAM SMITH, DICTIONARY OF GREEK AND ROMAN GEOGRAPHY v.2 1012 (1873); *see also* JOHN MILTON, PARADISE LOST, BOOK II lns. 592–94 ("A gulf profound, as that Serbonian bog / Betwixt Damiata and Mount Cassius old / Where armies whole have sunk[.]").

majority rule that emerged:

> People differ so widely in health, vitality, and ability to resist disease and injury that what may mean death to one man would be comparatively harmless to another, and therefore the fact that a given injury may not be generally lethal does not prevent it from becoming so under certain conditions, and if, under the peculiar temperament or condition or health of the individual upon whom it inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of the distinction as the sole producing cause.

*Id.* (quoting *Dreiskell v. United States Accident Ins. Co.*, 93 S.W. 880, 882 (Mo. Ct. App. 1906)).

The Washington State Supreme Court addressed the issue at length in *Kearney v. Washington National Ins. Co.*, 184 Wn. 579, 52 P.2d 903 (Wash. 1936). Mr. Robert Kearney, who had long suffered from snow blindness, drooping eyelids, and rheumatism, filed a claim for injuries, which the insurance company rejected. The insurance policy covered injuries sustained through "external, violent, and accidental means, and not directly or indirectly from any other cause or causes." *Id.* at 903. Mr. Kearney had fallen down a flight of stairs and struck his head while working as a night watchman at the Seattle ports. When he got up, his vision was gone. *Id.* After Mr. Kearney prevailed at trial, the insurance company moved for judgment as a matter of law, arguing that the vision loss fell outside the policy coverage because Mr. Kearney's pre-existing conditions had contributed to his injuries. The Court rejected the argument, establishing the rule that "where disease merely contributes to the death or accident, after being precipitated by the accident, it is not the proximate cause of the death or injury, nor a contributing cause, within the meaning of the terms of the policy." *Id.* at 904.

The State Supreme Court also discussed the issue in *Graham v. Police & Firemen's Insurance Ass'n*, 10 Wn.2d 288, 116 P.2d 352 (Wash. 1941). Oscar Ebbinghouse, who had long suffered from heart problems, secured an accidental-death policy indemnifying his wife in the event he "died through external, violent and accidental means independent of all other causes." *Id.* at 353. Mr. Ebbinghouse died from coronary occlusion ten days after he fell down the stairs while rushing to extinguish flames on

his young daughter's clothing. The jury returned a verdict for his widow, and the insurance company appealed, arguing that Mr. Ebbinghouse would have survived but for his heart condition. The Court rejected the argument, stating that "disease and low vitality do not rise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury." *Id.* at 355. The Court concluded:

> If it were otherwise, an accident policy such as the one under consideration would be of no value after the insured had contracted some disease regardless of the fact that premiums had been paid for many years. Such cannot be the intent of the contract. It is only necessary for the evidence to disclose that the accident was a direct and proximate cause of the death and that the proximate cause is that which sets in motion a train of events bringing about a result without the intervention of any force operating or working actively from a new and independent source.

*Id.* at 355 (internal markings omitted). The Court has never retreated from these holdings. *See, e.g., Music v. United Ins. Co. of America*, 59 Wn.2d 765, 370 P.2d 603, 606 (citing *Kearney* for the proposition that a policy holder's health *conditions* do not constitute *causes* of his injury (emphasis in opinion)).

These cases are directly on point. In each case, an insured party suffered from a condition that made him more vulnerable to the particular injuries his accidents caused. The Washington State Supreme Court distinguished a pre-existing health condition from the direct and proximate cause of a policy holder's injury. In short, Washington State has embraced the "eggshell-skulled insured" rule, requiring an insurance company to "take its policyholder as it found him[.]" *See* Scales, *Man, God and the Serbonian Bog*, 86 Iowa L. Rev. at 227. Under Plaintiff's theory, Mr. Scanlon, whose medical conditions left him weaker than healthier individuals, fell onto the hard tiles of his bathroom floor, thereby suffering fatal brain injury. Plaintiff concedes that a healthier person might have survived, but argues that Washington law contemplates that Mr. Scanlon might have nonetheless suffered a compensable accident. This Court agrees.

//

1     The Court finds further support for this interpretation in the preference of Washington courts to

2     interpret accident insurance contracts in a way that gives value to policy holders. *See Kearney*, 52 P.2d

3     at 904 ("If such insurance contracts are to be of any value to the man who pays for the risk assumed, a

4     construction as fair and reasonable as the limiting language will permit should be placed upon them.");

5     *see also* Scales, *Man, God and the Serbonian Bog*, 86 IOWA L. REV. at 225 n.224 (stating that courts

6     have historically avoided interpretations giving the "mere illusion of coverage."). Defendant agreed to

7     insure Mr. Scanlon against losses caused by accidents and collected insurance proceeds from Plaintiff

8     for more than three years. Mr. Scanlon suffered from multiple sclerosis and other maladies throughout

9     the life of the policy. This Court can imagine few types of accidents to which Mr. Scanlon, suffering as

10    he was from multiple sclerosis, was not more vulnerable than a healthier individual. If Defendant could

11    point to Mr. Scanlon's weakened condition as precluding recovery for an accident, "an accident policy

12    such as the one under consideration would be of no value after the insured had contracted some disease

13    regardless of the fact that premiums had been paid for many years." *Graham*, 116 P.2d at 355.

14    Finally, the Court finds support for this interpretation in Washington's rules of insurance-

15    contract interpretation. This Court has concluded that Plaintiff's proffered interpretation succeeds as a

16    matter of long-standing Washington State law. It goes without saying, therefore, that such an

17    interpretation is "reasonable." *Morgan*, 545 P.2d at 1195. Washington law is clear on this point: "It is

18    hornbook law that where a clause in an insurance policy is ambiguous, the meaning and construction

19    most favorable to the insured must be applied." *Owners Ass'n v. Allstate Ins. Co.*, 144 Wn.2d 130, 26

20    P.3d 910, 916 (Wash. 2001).

21    Defendant argues that this case is controlled by *Evans v. Metropolitan Insurance Company*, 26

22    Wn.2d 594, 174 P.2d 961 (Wash. 1946). Defendant's reliance is misplaced. The case involved an

23    accidental-death claim filed by the widow of Leon Evans, a sixty-one-year-old man who died of a heart

24    attack in July 1944. Mr. Evans and his wife were coming home from church when they started having

25

26

car problems. Mr. Evans pushed the family's two-ton automobile across a city street with a slight crown, stopping once in the middle of the street to avoid traffic, and then starting the car in motion again to get to the other side. The State Supreme Court described his final moments: "Mrs. Evans, who had been in the driver's seat, brought the car to a stop, and Mr. Evans moved toward the door of the driver's seat. As he reached the door he collapsed, and in a short time, ceased to live." *Evans*, 174 P. 2d at 964. The State Supreme Court therefore rejected Mrs. Evans' claim that her husband died from an accident:

> [T]he pushing of the automobile was the means by which the injury was caused, and there was nothing unforeseen, involuntary or unexpected in the act in which the insured was engaged from the time he started his car by pushing his foot on the pavement until he collapsed. There was no stumbling, slipping or falling in his movements. . . . He accomplished just what he intended to in the way he intended to, and in the free exercise of his own choice. No accident of any kind interfered with his movements, or for an instant relaxed his self-control. There was an unforeseen result of the insured's deliberate actions. The result of any action, however, cannot be considered in the determination of whether there was an accident.

*Evans*, 174 P.2d at 976. Mr. Evans' situation is easily distinguishable from Mr. Scanlon's. Under Plaintiff's theory, Mr. Scanlon fell and struck his head. He intended to shower or otherwise use the restroom, but instead slipped and fell onto the hard floor, causing an unforeseen, involuntary and unexpected event—an accidental fall. Mr. Evans, on the other hand, passed away without anything unexpected having happened other than the death itself.

This Court therefore interprets the policy language at question to allow recovery if Plaintiff establishes that Mr. Scanlon's death was caused by an accidental fall. The inclusionary clause provides recovery for loss "caused by an accident . . . which directly and from no other causes, results in a covered loss." (Policy 1 (Dkt. No. 55-2 at 2)). Mr. Scanlon's health problems were not "other causes" of his death. They were merely "contributing factors" which Defendant should have considered when it issued the policy. *See Music*, 370 P.2d at 606 (distinguishing factors and causes).

The insurance policy therefore forecloses many of Defendant's summary-judgment arguments sounding in questions of fact. For example, Defendant argues that the fall was not an accident because

Mr. Scanlon "had repeatedly fallen due to balance and gait problems associated with multiple sclerosis," (Def. Resp. 10 (Dkt. No. 75)), and that Mr. Scanlon "would not have died from the subdural hematoma if he was not on the anticoagulant therapy." (*Id.* 14). These arguments are foreclosed to Defendant as a matter of law. Defendant agreed to provide accident insurance to a man who suffered from particular health conditions. Whether those health conditions rendered him more likely to suffer an accident or more vulnerable to its effects is immaterial. As the State Supreme Court stated in *Smith v. Safeco Ins. Co.*, "The legal inquiry shapes what is a material fact." 78 P.3d at 1277.

### ii. Facts

An insured party seeking to recover under an accident policy need not submit direct, eyewitness evidence of how death occurred: "[A]ccidental death . . . may be established by reasonable inferences from circumstantial evidence." *Englehart v. General Electric Co.*, 11 Wn. App. 922, 527 P.2d 685, 688 (Wash. App. 1974). The party may not ask the fact-finder to indulge in nothing more than guesswork, however: "[I]f there is nothing more tangible to proceed upon than two or more conjectural theories under one or more of which a defendant would be liable and under one or more of which a plaintiff would not be allowed to recover, a jury will not be permitted to conjecture how the accident occurred." *Gardner v. Seymour*, 27 Wn.2d 802, 180 P.2d 564, 569 (Wash. 1947). The State Supreme Court summarized the rule in *Home Ins. Co. v. Northern Pac. Ry. Co.*:

> The rule is well established that the existence of a fact of facts cannot rest in guess, speculation, or conjecture. It is also the rule that the one having the affirmative of an issue does not have to make proof to an absolute certainty. It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the thing in question, such as the occurrence of a fire, happened in such a way as to fix liability upon the person charged therewith than it is that it happened in a way for which a person charged would not be liable. In applying the circumstantial evidence submitted to prove a fact, the trier of fact must recognize the distinction between that which is mere conjecture and what is a reasonable inference.

*Home Ins. Co.*, 18 Wn.2d 798, 140 P.2d 507, 509 (Wash. 1943).

//

Plaintiff asks the Court to conclude as a matter of law that her husband fell and struck his head, thereby causing the subdural hematoma from which he died. Plaintiff offers her own declaration, in which she avers that her husband was found naked, on a tiled bathroom floor, and near the shower. (Scanlon Decl. 2 (Dkt. No. 58-2)). Plaintiff also offers substantial evidence grounded in forensic science: She points to the autopsy and death certificate prepared by King County medical examiner Dr. Fusaro, both of which ascribe Mr. Scanlon's death to "subdural hematoma" caused by "minor occult blunt force trauma." The autopsy and death certificate also both categorize the cause of death as "accident." (Autopsy, Death Cert. (Dkt. No. 55-3 at 4, 11)). Plaintiff also points to San Joaquin County chief medical examiner Dr. Omalu's report, in which he concluded that "[t]he evidence unquestionably confirms that Michael Scanlon . . . died as a result of primary and secondary traumatic brain injuries sustained from a fall in an assisted-living facility." (Omalu Report 12 (Dkt. No. 55-4 at 33)). Dr. Omalu's report continued: "The manner of death is accident." (*Id.*). Finally, Plaintiff points to the report of Dr. Denton, a forensic pathologist whom Defendant paid to review the circumstances surrounding Mr. Scanlon's death. Dr. Denton also ascribed the death to a "subdural hematoma, presumed due to a minor occult blunt trauma of the head." (Denton Report 1 (Dkt. No. 55-4 at 49)). Dr. Denton also stated that "the manner of death is still best certified as accidental." (*Id.* 2).

Plaintiff argues that the circumstances of her husband's death, combined with the conclusions that three doctors reached by applying the methodology of forensic science, point to a single conclusion: Mr. Scanlon died from an accidental fall. (Pl. Mot. 5–7 (Dkt. No. 65)). The Court agrees.

Only one thing supports a finding other than an accidental fall: Dr. Hall's conclusion that Mr. Scanlon died from a heart attack. *See* (Hall Report (Dkt. No. 55-3 at 35)). Dr. Hall's bald assertion in a two-sentence memorandum report does not rise to the level of evidence, however. Doctors are permitted to offer medical conclusions before the trier of fact "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied

the principles and methods reliably to the facts of the case." FED. R. EV. 702. The Court knows that Ms. Leister forwarded particular materials to Dr. Hall. *See* (Letter to Hall (Dkt. No. 55-3 at 35)). The Court has no way of knowing whether Dr. Hall actually reviewed the facts and data contained in those materials, or what methodology he used to reach his conclusions. *See* (Hall Report 55-3 at 35)). This Court agrees with other federal district courts that have reviewed Dr. Hall's work. In concluding that Defendant had wrongfully withheld disability benefits from a policy holder, Judge Patel of the Northern District of California described "Dr. Hall's two-sentence analysis" as an "analytic nullity." *Gardner v. Bear Creek Corp.*, No. C06-02822-MHP, 2007 WL 2318969 at *18 (N.D. Cal. 2007); *see also Gordon v. Northwest Airlines Disability Income Plan*, 606 F.Supp.2d 1017, 1031 (describing Dr. Hall's work as "so cursory as to amount to mere rubber stamping.").

Plaintiff, on the other hand, submitted forensic evidence: Dr. Omalu prepared an extensive, twelve-page report that first documented Mr. Scanlon's injuries as revealed by the autopsy (Omalu Report 1–2 (Dkt. No. 55-4 at 22–23)), reviewed Mr. Scanlon's medical history (*Id.* 4), explicated the methodology of forensic science (*Id.* 5–8), explained how subdural hematomas typically occur (*Id.* 8–10), and then applied forensic methodology to the facts of Mr. Scanlon's case, thereby forming a conclusion. (*Id.* 10-12). Dr. Denton's report is not as extensive, but still exhibits the same marks of scientific rigor. Both Dr. Omalu and Dr. Denton concluded that Mr. Scanlon more likely than not died from a subdural hematoma caused by an accidental fall.

Because Plaintiff has submitted substantial circumstantial evidence tending to show that Mr. Scanlon died from a fall which caused a brain injury, and Defendant has offered nothing to rebut that evidence, summary judgment is appropriate. The Court therefore grants Plaintiff's motion for summary judgment with respect to her breach-of-contract claim.

//

//

**B.      Bad-Faith Breach of Contract**

An insurance contract creates a quasi-fiduciary relationship between an insurance company and the policy holder. *Van Noy v. State Farm Ins. Co.*, 142 Wn.2d 784, 16 P.3d 574, 578–79 (Wash. 2001). This relationship imposes upon insurance companies the duty to deal with policy holders in good faith in all dealings. The duty to deal in good faith is recognized in judicial decision and statute. *See, e.g., Tank v. State Farm Ins. Co.*, 105 Wn.2d 381, 715 P.2d 1133, 1136 (Wash. 1986) (collecting cases); WASH. REV. CODE 48.01.030 ("The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters.").

Bad-faith insurance claims sound in tort, and include the typical elements of duty, breach, but-for and proximate cause, and harm. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 78 P.3d 1274, 1277 (Wash. 2003). An insurance company's duty to a policy holder arises in contract, but a finding that an insurance company acted in bad faith represents more than a simple breach of contract; it represents "the intentional abuse of a fiduciary relationship." *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 951 P.2d 1124, 1126 (Wash. 1998). To prevail, a policy holder must prove more than simply that an insurer wrongly denied coverage: "In order to establish bad faith, an insured is required to show that the breach was unreasonable, frivolous, or unfounded." *Id.* A company behaves unreasonably if it denies coverage without reasonable justification. *See, e.g., Industrial Indemnity Co. v. Kallevig*, 114 Wn.2d 907, 792 P.2d 520, 526 (Wash. 1990) ("[A]n insurer must make a good-faith investigation of the facts before denying coverage and may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit."); *see also Truck Ins. Exchange v. Vanport Homes, Inc.*, 147 Wn.2d 751, 58 P.3d 276, 283 (Wash. 2002) (affirming a finding of bad faith when an insurance company denied coverage "based on a laundry list of exclusions without any analysis or correlation to the particular claims.").

Whether an insurance company's behavior constituted bad faith is a question of fact, typically reserved to the jury. *Smith*, 78 P.3d at 1277. That does not preclude summary judgment in the appropriate circumstances: "Questions of fact may be determined on summary judgment as a matter of law where reasonable minds could reach but one conclusion." *Id.*

Plaintiff argues that summary judgment is appropriate because Defendant investigated the cause of her husband's death with an eye toward denying her claim, regardless of the facts. Plaintiff also argues that Defendant's interpretation of Washington law was so unreasonable that it amounts to bad faith. (Pl. Mot. 21–22 (Dkt. No. 65)); (Pl. Resp. 19–22 (Dkt. No. 58)). In support of her motion, Plaintiff submits the declaration of Mr. Burt Bernstein, a California attorney who worked for a life-insurance company for thirty years,  until he retired as the vice president of the company's claims department. (Bernstein Decl. 1 (Dkt. No. 58-6)). After reviewing the claims process in this case, Mr. Bernstein states, "[Defendant's] investigation was inadequate, the interpretation of its own contract was incorrect, and it appears that LINA attempted to find reasons, supported or not, at every step, to deny this claim, as opposed to taking the opportunity to conduct a full and fair investigation." (*Id.* 5).

Defendant argues that it is entitled to summary judgment because Mr. Scanlon's anticoagulant drugs contributed to his death. Defendant states, "Clearly, LINA's policy excludes coverage for deaths which are contributed to by medical conditions and are not pure accidents." (Def. Mot. 10 (Dkt. No. 54)). Defendant submits the declaration of Mr. Frank Caliri III, an independent insurance consultant. After reviewing the claims process, he concluded that Defendant's actions "have been prompt, helpful, courteous, and within the standards of fair claim-handling practices." (Caliri Decl. 7 (Dkt. No. 78-3)).

The Court is not persuaded. The undisputed facts show that Plaintiff submitted a claim to Defendant's agent Ms. Leister, on which Plaintiff stated that her husband had died from a fall which caused a subdural hematoma. (Claim (Dkt. No. 55-3 at 14)). Over the course of the next several months, Ms. Leister secured Mr. Scanlon's medical records, including his autopsy and death certificate. Both

stated that Mr. Scanlon had died from a subdural hematoma, presumed to have been caused by blunt force trauma to the head. Both also stated that the cause of death was "accident." (Autopsy, Death Cert. (Dkt. No. 55-3 at 4, 11)). Presumably, Ms. Leister also secured the hospital death report, which also attributed Mr. Scanlon's death to a subdural hematoma. (Hospital Report (Dkt. No. 79 at 77)). Approximately five months after Plaintiff submitted the claim for benefits, Ms. Leister wrote to physician-adviser Dr. Hall, asking for his assessment. (Letter to Dr. Hall (Dkt. No. 55-3 at 33)). Dr. Hall responded the same day Ms. Leister sent him the request, attributing Mr. Scanlon's death to a heart attack. (Hall Report (Dkt. No. 55-3 at 35)). Two days later, Ms. Leister wrote to Plaintiff, denying the claim because "the medical evidence and [the] physician-adviser's review have established that Michael Scanlon's fall was the result of an acute myocardial infarction and accelerated by anticoagulant therapy." (Denial Letter 3 (Dkt. No. 55-3 at 39)).

The undisputed facts show that Defendant supplied Ms. Leister with a claims-processing manual providing her with guidelines for conducting accident-policy investigations into falls. (AD&D Guide (Dkt. No. 58-3)). The manual states in part, "[W]e do not rule out liability for accidental loss solely because the insured was physically infirm or because the fall was attributable to weakness or advanced age." (*Id.* 13). The manual continues: "[T]o apply the contribution-of-disease exclusion, you must prove definitively that illness caused the fall and the fall caused the resulting loss. . . . [W]hen the loss is due to the injury alone, we may not apply the contribution-of-disease exclusion even if an illness existed at the time of the injury." (*Id.* 14).

The undisputed facts show that Plaintiff secured the representation of attorney Mr. Nelson after receiving the denial letter. Mr. Nelson wrote a letter to Defendant's agent, Mr. Billeter, offering to settle the case for a fixed sum. Mr. Nelson also supplied Mr. Billeter with a twelve-page report prepared by the San Joaquin chief medical examiner, which concluded that Mr. Scanlon had died just as the hospital physicians, autopsy doctor, and his wife had reported—specifically, that he "suffered a fall on

November 1, 2006, at the assisted-living center where he was living." (Omalu Report 11 (Dkt. No. 55-4)). Mr. Billeter therefore asked Dr. Denton to perform a forensic investigation. Dr. Denton concluded that the cause of death was "best certified as accidental." (Denton Report 2 (Dkt. No. 55-4 at 50)). Mr. Billeter nonetheless persisted in denying coverage.

Summary judgment for Plaintiff is appropriate on these facts. No reasonable juror could find that Ms. Leister conducted a reasonable investigation, in which she embraced her "quasi-fiduciary relationship" with Plaintiff, and gave "equal consideration to [Plaintiff's] interests." *See Tank*, 715 P.2d at 1136. Ms. Leister had received reports from several different medical professionals and the statement of Plaintiff, all of which indicated that Mr. Scanlon had died from brain injuries after an accidental fall. She ignored these conclusions. Instead, she concluded that Mr. Scanlon had died from a heart attack, relying only on Dr. Hall's two-sentence memorandum. Even if Dr. Hall's opinion were worthy of consideration, Ms. Leister was confronted with conflicting conclusions. If she had referred the case to another investigator, such as Dr. Denton, she would have learned that the cause of death was "best certified as accidental." Ms. Leister failed to resolve the conflicting opinions, however. In fact, she failed to perform any further investigation whatsoever. Immediately after hearing from the first doctor who gave her a reason to deny Plaintiff's claim, she sent a denial letter. Such behavior manifests bad faith. *See Kallevig*, 792 P.2d at 526 ("[A]n insurer . . . may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit.").

Defendant's arguments against summary judgment are unconvincing. Defendant states that "[t]he evidence before the Court is that [Mr. Scanlon] fell because of a heart attack[,]" (Def. Opp'n 18 (Dkt. No. 75)), and that "[i]t is indisputable that the medication [Mr. Scanlon] took for his heart medications—blood-thinning conditions—contributed to his death." (Def. Mot. 10 (Dkt. No. 54)). As discussed above, Defendant has failed to offer evidence from which a reasonable juror could find that Mr. Scanlon died from a heart attack. Defendant's second argument fails as a matter of law. Mr.

Scanlon's medications may have *contributed* to his death, but they in no way *caused* his death. *See Music*, 370 P.3d at 606 (distinguishing health conditions from proximate causes). Defendant's own claims-processing manual states the relevant law well enough: "In proximate-cause jurisdictions, all that must be proven for recovery is that the fall initiated a series of events that led to the loss." (AD&D Guide (Dkt. No. 58-3 at 13)). Washington is a proximate-cause jurisdiction, which means that it is immaterial whether Mr. Scanlon's medications rendered him more vulnerable to the fall than a healthier person would have been. The fall initiated a series of events—one of which was increased bleeding because of his medications—that led to Mr. Scanlon's death. Therefore, Plaintiff proved "all that must be proven for recovery." (*Id.*).

### i. **Emotional Distress**

Because bad-faith policy breach sounds in tort, general tort damages are available to a prevailing plaintiff. *See, e.g., Coventry v. American States Ins. Co.*, 136 Wn.2d 269, 961 P.2d 933, 939–940 (Wash. 1998). These include damages for emotional distress. *See Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 164 P.3d 454 (Wash. 2007). In *Woo*, the State Supreme Court determined that a party can rely exclusively on his or her own testimony to establish emotional distress in a bad-faith insurance case. *Id.* at 467–68. Plaintiff has alleged that she suffered nightmares and had sleeping problems because of Defendant's wrongful denial of her claim for benefits. She further alleges that she broke out in shingles, which her doctors informed her was the result of stress. (Scanlon Decl. 3 (Dkt. No. 58-1)).

Defendant argues that different cases are controlling, pointing to *Kleopfel v. Bokor*, 149 Wn.2d 192, 66 P.3d 630 (Wash. 2003), and *Hegel v. McMahon*, 136 Wn.2d 122, 960 P.2d 424 (Wash. 1998). These cases deal with intentional infliction of emotional distress and negligent infliction of emotional distress, respectively. If anything, these cases stand for the proposition that claims for emotional-distress damages impose different evidentiary obstacles depending upon a plaintiff's underlying cause of action. *Compare Kloepfel*, 66 P.3d at 633 ("Quite simply, *objective symptomatology is not required* to establish

intentional infliction of emotional distress.") *with Hegel*, 960 P.2d at 430 ("In order to recover for negligent infliction of emotional distress, a plaintiff's emotional response *must be . . . corroborated by objective symptomatology*.") (emphases added in both cases).

Plaintiff's claim of emotional distress would not necessarily fail under Defendant's proffered standards. She alleges that doctors diagnosed her with a physical ailment attributable to stress while she was struggling with how to handle her mortgage obligations shortly after her husband's death. This probably rises to the level of objective symptomatology. Nonetheless, this Court concludes that *Woo* controls this case. Plaintiff's allegations are sufficient to create a jury question as to whether she suffered emotional distress.

**C.    Consumer Protection Act**

The Washington State Consumer Protection Act (CPA) outlaws "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or business." WASH. REV. CODE § 19.86.020. The Act authorizes private citizens to enforce its strictures. *Id.* § 19.86.090. To prevail, "a private citizen must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act." *Kallevig*, 792 P.2d at 920–21. The Act expressly declares that "actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions [outlawing unfair methods of competition and unfair or deceptive acts]." WASH. REV. CODE § 19.86.170.

The State Insurance Commissioner is a creation of statute, authorized to promulgate insurance regulations. *Id.* § 48.02.010 (creating the office); *Id.* § 48.02.060 (listing the Commissioner's powers, which include the authority to "make reasonable rules and regulations for effectuating any provision of this code[.]"). The Commissioner has promulgated regulations that "define certain minimum standards, which, if violated with such frequency as to indicate a general business practice, will be deemed to

constitute unfair claims-settlement practices." WASH. ADMIN. CODE § 284-30-300.

The State Supreme Court has declared that a private party establishes the first element of a CPA claim by showing that an insurance company violated one of the Commissioner's regulations. *See Kallevig*, 792 P.2d at 924 ("[A]n insured may establish a *per se* unfair trade practice under the CPA by demonstrating a violation of WASH. REV. CODE § 48.30.010 based upon a single violation of WASH. ADMIN. CODE § 284-30-330."). The private party still bears the burden of establishing the other four elements. *See Kallevig*, 792 P.2d at 925 ("[A] violation of WASH. REV. CODE § 48.30.010 is a *per se* unfair trade practice and satisfies the *first element* of the five-part test for bringing a CPA action[.]") (emphasis added).

Plaintiff states that Defendant violated several different Washington State insurance regulations. *See* (Pl. Opp'n 22 (Dkt. No. 58)) ("Specifically, LINA's unreasonable conduct violated subsections (1), (3), (4), (6), (7), and (13) of WASH. ADMIN. CODE § 284-30-330."). Plaintiff devotes almost her entire argument to what she alleges was an unreasonably lengthy claims process, however. *See* (Pl. Mot. 21 (Dkt. No. 65)) Plaintiff argues that by taking five months to process her claim, Defendant "fail[ed] to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies." WASH. ADMIN. CODE § 284-30-330(3). Plaintiff fails to brief her remaining theories of liability. This Court therefore considers only Plaintiff's claim that Defendant's investigation was unreasonably long.

Plaintiff filed her claim for benefits with her employer, King County. Plaintiff filed her claim on November 8, 2006, but King County failed to forward the information to Defendant until December 5, 2006. (Facsimile (Dkt. No. 78-3 at 34)). Ms. Leister wrote to Plaintiff on December 12, 2006, introducing herself and explaining the claims process. (Letter (Dkt. No. 78-3 at 18)). Ms. Leister also notified Mr. Scanlon's medical providers in mid-December 2006, asking them to send her his medical records. (Letters (Dkt. No. 55-3 at 22–25)). One provider refused to provide the records without

additional authorization from Plaintiff. Ms. Leister therefore wrote to Plaintiff in mid-January 2007, asking that she complete the requisite forms. (Letter (Dkt. No. 78-3 at 22)). Ms. Leister sent Plaintiff approximately one letter per month keeping her apprised of her claim status. Mr. Leister had still not received all Mr. Scanlon's medical records as of March 2, 2007. (Letter (Dkt. No. 78-3 at 25)). Within one month of receiving all the required records, Defendant's agent Ms. Leister had rendered a claims decision. (Denial Letter (Dkt. No. 78-3 at 29–32)). Defendant argues that it is entitled to summary judgment on these facts. *See* (Def. Mot. (Dkt. No. 54)).

Defendant is correct. Plaintiff nowhere deals with the fact that it took King County one month to send her claim to Defendant for review, or that it took one of Mr. Scanlon's medical providers several months to send Defendant his medical records. These are key facts. A claims processor cannot conduct a thorough investigation until all the required information is before her. The clock did not start ticking, therefore, until mid-March, when Ms. Leister had all Mr. Scanlon's records. No reasonable jury could find that the three weeks constitutes an unreasonably lengthy claims process. Even if this Court were to conclude that the claims process was unreasonably long, Plaintiff nowhere establishes any of the remaining four elements of CPA liability. The State Supreme Court has declared that a violation of an insurance regulation constitutes a *per se* unfair trade practice, but has also expressly declared that a private citizen must prove more in order to prevail under the CPA. *See Kallevig*, 792 P.2d at 920–21 ("[A] private citizen must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act."). Because Plaintiff failed to respond to Defendant's properly supported motion for summary judgment with any evidence tending to show any of the other four elements she bears the burden of proving**,** her claim fails.

//

//

**D.    Attorney Fees**

Because of the quasi-fiduciary nature of insurance contracts, Washington State treats them differently than other commercial contracts. *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673, 681 (Wash. 1991). A special rule governs awards of attorney fees: "Generally, attorney fees are not recoverable in the absence of a contract term or statute allowing for their recovery. [Washington courts] have recognized in the insurance context, however, that an insured who is compelled to assume the burden of legal action to obtain the benefit of an insurance contract is entitled to attorney fees, whether or not the insurance policy contains a provision for such fees." *Public Utility District No. 1 v. International Ins. Co.*, 124 Wn.2d 789, 881 P.2d 1020, 1034 (Wash. 1994). *Accord Olympic Steamship*, 811 P.2d at 681 ("[A]n award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract[.]"). Defendant does not dispute these statements of law. Defendant's only arguments sound in the merits of Plaintiff's underlying claim. *See* (Def. Opp'n 22 (Dkt. No. 75)) ("Since [Plaintiff's] claim for contract benefits should be dismissed he [sic] is not entitled to *Olympic Steamship* fees.").

Plaintiff prevailed in an insurance claim for benefits. She is therefore entitled to reasonable attorney fees.

**IV.    CONCLUSION**

The Court GRANTS Plaintiff's motion for partial summary judgment in part and DENIES the motion in part. *See* (Pl. Mot. (Dkt. No. 65)). The Court GRANTS the motion with respect to claims sounding in policy coverage and bad-faith breach. The Court also GRANTS Plaintiff's motion for attorney fees, and concludes that Plaintiff may submit her claim for emotional distress to the jury. The Court DENIES Plaintiff's motion with respect to her claim sounding the Washington Consumer Protection Act.

The Court GRANTS Defendant's motion for summary judgment in part and DENIES the motion in part (Def. Mot. (Dkt. No. 54)). The Court GRANTS Defendant's motion with respect to Plaintiff's claim sounding in the Washington Consumer Protection Act. The Court DENIES Defendant's motion with respect to all other claims.

SO ORDERED this 13th day of November, 2009.

JOHN C. COUGHENOUR
United States District Judge